**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) Case No. 20-06002-01-CR-SJ-DGK |
| | ) |
| **Plaintiff,** | ) **Kansas City, Missouri** |
| | ) **July 28, 2020** |
| **v.** | ) |
| | ) |
| **CLINT ROBERT SCHRAM,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**PARTIAL TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE LAJUANA M. COUNTS
UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

For the Plaintiff:           Ms. Alison D. Dunning
                             Assistant United States Attorney
                             400 E. Ninth St., Ste. 5510
                             Kansas City, MO  64106
                             (816) 426-3122

For the Defendant:          Mr. Todd M. Schultz
                             Federal Public Defender's Off.
                             1000 Walnut Street, Ste. 600
                             Kansas City, MO  64106
                             (816) 471-8282

Court Audio Operator:       Ms. Traci Chorny

Transcribed by:             Rapid Transcript
                             Lissa C. Whittaker
                             1001 West 65th Street
                             Kansas City, MO  64113
                             (816) 914-3613


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1    (Court in Session at 3:09 p.m.)

2             *  *  *  *  *  *  *  *  *  *

3       ASHLEY DAVIS, GOVERNMENT'S WITNESS, SWORN

4        THE COURT:  All right.  Thank you.  Ms. Dunning.

5                   DIRECT EXAMINATION

6  BY MS. DUNNING:

7  Q.  So, would you please state your name for the record?

8  A.  Yes.  It's Ashley Davis.

9  Q.  And where are you employed?

10 A.  For the Federal Bureau of Investigation in Kansas City.

11 Q.  What do you do there?

12 A.  I'm a Special Agent.  I work crimes against children,

13 generally Internet crimes.  So, crimes pertaining to the

14 production, distribution, receipt of child pornography.

15 Q.  Okay.  And how long have you been doing that?

16 A.  About five years.  But currently only for about a year and a

17 half.

18 Q.  Okay.  And overall, how long have you been with the FBI?

19 A.  It has been almost 14 years.

20 Q.  Okay.  Now, are you familiar with the investigation of the

21 defendant in this case, Clint Schram?

22 A.  Yes.

23 Q.  Okay.  And have you had the opportunity to review the

24 information in the Government's detention motion in Section C?

25 A.  Yes.

1  Q.  Okay.  And if I were to ask you information about -- or

2  questions about that information, would your testimony be

3  consistent with that information?

4  A.  Yes.

5  Q.  In other words, is that an accurate summary of the

6  investigation as you know it to be?

7  A.  Yes.

8  Q.  Okay.  So, if we miss anything, I just want to sort of make

9  that clear.  But I do want to go through things with you.  So,

10  you understand that the defendant is charged with nine counts

11  involving the hosting of websites that are dedicated to

12  advisement and distribution of child pornography?

13  A.  Yes.

14  Q.  And those -- does your investigation, or does the

15  investigation by the FBI indicate that those websites also

16  regularly involve folks discussing child sexual abuse?

17  A.  Yes.

18  Q.  Essentially did it work in the way that people would post

19  links on the site and after they'd identify the age of a child

20  and what kind of conduct was involved?

21  A.  Yes.

22  Q.  And then they could click on that link and be taken to

23  another site and then obtain child pornography in that manner.

24  Is that a fair rendition of how this works?

25  A.  Yes, that's right.

1  Q.  Okay.  Was the FBI able to determine that the sites were

2  hosted in Mr. Schram's home?

3  A.  Yes.

4  Q.  What was the address of his home?

5  A.  8524 North Ava Avenue in Kansas City, Missouri.

6  Q.  And that's here in the Western District?

7  A.  Yes.

8  Q.  And did you have indication that Mr. Schram had lived in that

9  house at least for several years, a number of years?

10 A.  Yes.

11 Q.  Okay.  So, the charges in this case date back to at least

12 February 21 of 2019.  Is that accurate?

13 A.  That's correct.

14 Q.  Okay.  And so certainly he was living in that same home at

15 that time, correct?

16 A.  Right.

17 Q.  Now, after his arrest and on the Indictment in this case, was

18 the defendant interviewed?

19 A.  Yes.

20 Q.  Did you ask him about his involvement with the websites?

21 A.  I did not ask him, but another FBI agent and an FBI TFO did.

22 Q.  Okay.  And so, I apologize.  I know sometimes I may use the

23 collective we, so I appreciate you correcting that.  So, he was

24 asked about his involvement.  And did he acknowledge that he had,

25 in fact, been the host of the four -- of the websites?

1  A.  Yes.

2  Q.  And did he also admit that he was behind some usernames that

3  were seen on -- operating on the websites?

4  A.  Yes, he did.

5  Q.  Were those usernames already identified by the FBI and

6  suspected to be Mr. Schram?

7  A.  Yes.

8  Q.  Did he confirm that he was, in fact, those usernames?

9  A.  He did.

10  Q.  Okay.  And I'm sure it's -- it comes as no surprise that the

11  usernames, folks interacted on these websites by username that

12  are not their real names.

13  A.  Right.

14  Q.  And anonymity was important on these websites.  Is that a

15  fair statement?

16  A.  That is, yes.

17  Q.  Okay.  As one of those usernames, maybe multiple usernames,

18  did the defendant admit to hosting and downloading child

19  pornography?

20  A.  Yes.

21  Q.  And did he say how long he had been involved in child

22  pornography or when his involvement first started, kind of what

23  the arc of that was?

24  A.  I believe he said that it had been going on for 20 years.

25  And then he had stopped for a period of time and he had, I

1  believe started within the last five years again.

2  Q.  Okay.  Did he acknowledge that he still -- that he possessed

3  child pornography outside of the sites?

4  A.  Yes.

5  Q.  Okay.  And what -- how would you quantify the number of

6  images and/or videos?

7  A.  That he had on -- in his possession?

8  Q.  Yeah.  Was it a small amount, a large amount?  Was it a --

9  A.  Oh, it was -- it was a large -- it was a large amount in a

10  folder on his computer.

11  Q.  Okay.  I want to talk about some particular information that

12  was recovered, but I want to do it from the perspective of what

13  his admissions were.  Did he admit that he had spoken to an

14  individual about a plot to kidnap and rape and murder a young

15  child?

16  A.  Yes.

17  Q.  And did he ultimately say that was just a fantasy from his

18  perspective?

19  A.  He did.

20  Q.  Okay.  But were investigators able to determine the real

21  people involved in this plot?

22  A.  Yes.

23  Q.  Okay.  So, I want to talk to you, this is outlined in the

24  Government's detention motion, and so, the way that it's written,

25  it refers to the defendant as User 1.  But that -- he admitted

1  that he was involved in that, correct?

2  A.  Yes, he did.

3  Q.  Okay.  And the person that he was communicating with is

4  identified as someone called Minor Subject.  And so is that

5  because that person was a juvenile?

6  A.  Yes.

7  Q.  Okay.  And there was a Minor Victim that is mentioned.  And

8  was that person identified ultimately as a real pre-pubescent

9  female child?

10  A.  Yes.

11  Q.  Okay.  Can you describe just sort of in general, did the

12  minor suspect or that juvenile suspect, did he know the Minor

13  Victim child?

14  A.  Yes.  His parents were family friends with the Minor Victim's

15  parents, and they would visit the minor -- the Minor Victim's

16  family home.

17  Q.  And ultimately, did the defendant and the Minor Subject, did

18  the defendant receive some photographs of the intended victim

19  from the Minor Subject?

20  A.  Yes.

21  Q.  Did he share those with other users or user (inaudible)?

22  A.  Yes.

23  Q.  Okay.  And did those photographs help identify who that Minor

24  Victim was?

25  A.  Yes.

1  Q.  Do you remember her age approximately?

2  A.  Approximately eight years old.

3  Q.  Okay.  And what was the nature of the -- what they were

4  discussing doing to the child?

5  A.  The plan was to kidnap the child, rape her, and murder her,

6  and then dispose of the body in a way that the body not be

7  recovered.

8  Q.  Were investigators, when they identified who the Minor

9  Subject was, were they able to conduct a search of his residence?

10 A.  Yes.

11 Q.  And did they find some notes that sort of outlined the plan

12 that you've just described in greater detail?

13 A.  They did.  They found some notes related to that plan and

14 then various potential outcomes of the plan or various details

15 concerning how they would kidnap her, whether it would be a

16 passive kidnaping or an aggressing kidnaping.  So, meaning, would

17 they sneak in and drug her and sneak her out, or would they go in

18 aggressively with weapons and tie everyone up and then kidnap the

19 girl and leave.

20 Q.  Okay.  And was there a statement that was made, and if you

21 can't remember exactly what it was, but was there some discussion

22 about what to do if there was someone else around or a witness?

23 A.  The only thing I remember about that was that there was a

24 comment about harming -- harming the parents because it was

25 better than it was them instead of -- it was better that it was

1   her parents who were hurt than the Minor Subject and the

2   defendant being caught.

3   Q.  Okay.  So, kind of something like better them than me?

4   A.  Right.

5   Q.  Okay.  And ultimately, thankfully, this didn't occur, is that

6   right?

7   A.  That's correct.

8   Q.  Okay.

9                       (Off Record Talking)

10  BY MS. DUNNING:

11  Q.  Was there an element (inaudible)?

12          THE COURT:  Did someone say something?

13          MS. DUNNING:  Well, I thought somebody did, but now I'm

14  getting a little sign that says my Internet connection is

15  unstable, so.

16          THE COURT:  Okay.

17          MS. DUNNING:  I'll try to -- I think everything just

18  froze for a moment.

19  BY MS. DUNNING:

20  Q.  Was there a discussion in the -- between the two about doing

21  certain things at gunpoint?  Or do you recall a mention of that?

22  A.  I don't recall.

23  Q.  Okay.  That's okay.  So, did the defendant, when he -- did he

24  admit to having this discussion with the Minor Subject and these

25  various -- in some detail, did he acknowledge he had this

1   discussion we just described?

2   A.  Yes.

3   Q.  Did he say how he made it easier, I guess, to discuss -- have

4   this discussion?  Did he do anything to make it easier?

5   A.  He set up a couple of websites that were just for the

6   communications with the Minor Subject.

7   Q.  And did he say anything about how he had sort of assessed the

8   mental state of the Minor Subject?

9   A.  He said that he thought that the Minor Subject was disturbed.

10  Q.  Okay.  And did the Minor Subject and that Minor Victim, did

11  they both live out of state, closer to the East Coast?

12  A.  They did.

13  Q.  Okay.  And when he was -- was he ever asked about any

14  impediment to him physically participating in this scheme in

15  person?

16  A.  Yes.  My understanding is that he -- his first response about

17  not going through with the plan was because he needed gas money.

18  He couldn't afford the gas money to get there.

19  Q.  Okay.  But he did at some point say it was all fantasy on his

20  end?

21  A.  Yes.

22  Q.  Okay.  And was there information obtained during the

23  investigation that he discussed the same type of information with

24  a different user on one of the sites?

25  A.  Yes.

1  Q.  Was the content fairly similar?

2  A.  It was.

3  Q.  And did it involve options of the aggressive plan and the

4  passive plan?

5  A.  Yes.

6  Q.  Was there a couple of search warrants that were done of the

7  defendant's Google accounts as well as Internet search history?

8  A.  Yes.

9  Q.  Okay.  And were there some searches that were of evidentiary

10  value to you all and that were concerning from your perspective?

11  A.  Yes.

12  Q.  Okay.  Can you talk to us about, I know that there are some

13  searches involving harming others.  And can you describe for us

14  what those detailed?

15  A.  Primarily, the searches were pertaining to how to murder

16  someone and get away with it, what the penalty was for murder,

17  whether or not you could be convicted of murder without a body.

18  There were searches in there about how to make pressure cooker

19  bombs, homemade napalm, what the inside of a prison cell looked

20  like, information about mass shootings, like some searches for

21  mass shootings.  It was that type of -- that type of subject.

22  Q.  Okay.  And were there searches on the penalties for murder,

23  for rape, and about the death penalty?

24  A.  Yes.  Yes.

25  Q.  And was there also searches pertaining to particular

1  individuals?

2  A.  Yes.

3  Q.  Okay.  So, I want to talk to you about some searches related

4  to a pastor that has been identified, but I won't ask you to

5  mention the name.  But can you tell us the searches involved?

6  A.  Yes.  They were searches for the pastor.  And there were some

7  e-mails that were sent from the defendant to that particular

8  pastor that were threatening in nature.

9  Q.  Did it appear from the communications that the defendant in

10 fact knew the pastor in real life?

11 A.  Yes.

12 Q.  Okay.  And was there another individual that was known to the

13 defendant that he was searching for, --

14 A.  Yes.

15 Q.  -- for the Internet searches related to that person?

16 A.  Yes.  Numerous searches for this particular individual.

17 Q.  Okay.  And again, the person's identity is known, correct?

18 A.  Correct.

19 Q.  You've actually contacted him?

20 A.  Yes.

21 Q.  And I won't ask you to identify him here, but is this -- what

22 was the relationship between this person and the defendant?

23 A.  He was a co-worker, a former co-worker.

24 Q.  Okay.  Where did they work together?

25 A.  At the Ford assembly plant in Claycomo, Missouri.

1  Q.  Okay.  What kind of searches did you see the defendant

2  conducting with this particular individual?

3  A.  He was searching for the former co-worker's address and for

4  the former co-worker's spouse's address.  And at the same time

5  that he searched for the former co-worker and the spouse and

6  their residence, he was searching for -- that was at the same

7  time that he was searching for how to murder someone.  And he was

8  also searching for the pressure cooker bombs, the homemade

9  napalm, those types of things, the mass shooting.  That was all

10 around the same time as the searches for the former co-worker and

11 the former co-worker's family.

12 Q.  Okay.  Did you know through searches of public records that

13 this former co-worker had an order of protection against the

14 defendant from January 2018 through January 2019?

15 A.  Yes.

16 Q.  And did some of those searches coincide with those time

17 frames as well?

18 A.  Yes.

19 Q.  Okay.

20 A.  All of the searches, I believe, were between January of 2019

21 and maybe June of 2019, give or take a month.

22 Q.  Okay.  And so that would be about the time frame that the

23 order of protection that this person had against the defendant

24 was due to expire.

25 A.  Right.

1   Q.  Or had expired.  So, let's talk about the defendant's

2   interview.  Did you ask him about this individual that we'll

3   refer to as the former co-worker?

4   A.  We did ask him.

5   Q.  Yeah.

6   A.  Yes.

7   Q.  And did he acknowledge that he knew him?

8   A.  Yes, he did.

9   Q.  Okay.  What did he -- did he acknowledge that he'd been angry

10  with him?

11  A.  Yes.  He said he was very angry with this individual because

12  he felt like the former co-worker was responsible for getting him

13  fired.

14  Q.  Okay.  And what was particularly egregious about the timing

15  of the firing from the defendant's perspective?  Did he say?

16  A.  He was only a few years away from retirement.

17  Q.  Okay.  Did you see anything in the search of the defendant's

18  home that indicated that he had, in fact, worked at Ford for some

19  long amount of time?

20          THE DEFENDANT:  Twenty-five years.

21          THE WITNESS:  Yeah.  There were -- in the defendant's

22  office on a shelf, there were two service awards from Ford.  One

23  for 20 years and one for 25 years.

24  BY MS. DUNNING:

25  Q.  Okay.  And so was the defendant asked about the searches for

1  this co-worker and his wife and what the purpose for those was?

2  A.  Yes, he was asked.

3  Q.  And what did he explain?

4  A.  He said that he was very angry with the co-worker.  And so he

5  had planned to kill him, but then he thought that it would be

6  more hurtful to the co-worker if he killed the co-worker's family

7  instead.  And then we asked him about the pressure cooker bomb,

8  and he said he was going to throw that into a Ford union meeting.

9  And one of the agents there said, well, what about all of the

10 innocent people who would have been in there?  And he said, well,

11 they were collateral damage.

12 Q.  Okay.  And so did he admit if the searches involving murder

13 and bombs had any connection to this specific individual?

14 A.  Yes.  He was very upset with that former co-worker and those

15 searches were -- they pertained to that co-worker and to the Ford

16 employees.

17 Q.  Was he asked whether or not he was serious about that?  About

18 the --

19 A.  He was.

20 Q.  Okay.

21 A.  He was.  He said he had not followed through with it because

22 he didn't want to go to jail.  He didn't want to be in prison.

23 But then he acknowledged that he was probably looking at jail

24 time in this particular case.  And --

25 Q.  And was that concerning to the investigators that were

1  speaking to him?

2  A.  It was because based on the conversation with the defendant,

3  it didn't seem as though the defendant was over what had

4  happened.  It seemed as though the defendant was still very upset

5  with the former co-worker.

6  Q.  Okay.  Was the former co-worker contacted after the

7  defendant's indictment and arrest?

8  A.  Yes.

9  Q.  And can you tell us, starting with -- just what was the

10 reaction that he had when you all showed up at his workplace?

11 A.  So, we showed up and we asked to speak with him.  And they

12 took us back to an area of HR, and he came in probably about ten

13 minutes later.  And he was --

14      MR. SCHULTZ:  Your Honor, I'm going to object at this

15 point to hearsay and relevance.

16      THE COURT:  For purposes of this hearing, I'll overrule

17 that objection.

18 BY MS. DUNNING:

19 Q.  And so what did he -- you said he arrived about ten minutes

20 later, and what was his reaction?  What did he share with you

21 all?

22 A.  That he was really scared because he -- when he found out

23 that the FBI was at his work, he thought that something had

24 happened to his family.

25 Q.  And did he specifically relate that to the defendant in any

1  way?

2  A.  Yes.  During the course of the interview, he indicated that

3  he was terrified of the defendant.

4  Q.  All right.  Can you give us a -- so, the defendant had

5  admitted to some of this conduct in terms of searching for this

6  individual and why he was mad at him.  Did that individual

7  confirm that type of relationship with the defendant?

8  A.  Yes.

9  Q.  In other words, that they had worked together and that he

10 knew the defendant was mad at him?

11 A.  Yes.  He knew the defendant was very upset with him and the

12 co-worker had gone so far as to try to protect himself and his

13 family in various ways.

14 Q.  Okay.  Have they moved?

15 A.  Yes.  They moved from their home.  They purchased guns and he

16 taught his daughters how to shoot those weapons.

17 Q.  And did he say that he had, in fact, received threats from

18 the defendant?

19 A.  Yes, numerous threats.

20 Q.  What kind of threats?

21 A.  That he was going -- that the defendant was going to kill the

22 former co-worker.  That the defendant would kill the co-worker's

23 family.  That the defendant would rape and kill the co-worker's

24 daughters, who at the time were 13 and 18 years old.  The

25 defendant sent him hate mail, sent him pictures of a parcel of

1   land that the co-worker had purchased down at Lake of the Ozarks,

2   and sent the address for the co-worker's daughter when she

3   started attending school at a college.  The defendant sent a --

4   sent the address.  And also sent photographs of the co-worker's

5   daughters to the co-worker.

6   Q.  Okay.  So, somehow he had identified the address where the

7   co-worker's daughter would be living at college and sent that to

8   the co-worker?

9   A.  Right.

10  Q.  And the photographs that you mentioned, did those get taken

11  by the defendant or where did -- where were those obtained?

12  A.  They were taken from -- the co-worker believed they were

13  taken from the Facebook pages of his daughters.  He was -- he

14  didn't know how the defendant had obtained those pictures.

15  Q.  Okay.  And did the co-worker acknowledge having heard Mr.

16  Schram say something about blowing the Ford plant before?

17  A.  Yes.

18  Q.  Okay.

19          THE DEFENDANT:  That's not true.

20  BY MS. DUNNING:

21  Q.  And did the co-worker claim that Mr. Schram had, I guess and

22  -- was the co-worker a union rep?

23  A.  Yes.

24  Q.  And was he the defendant's union rep?

25  A.  He was.

1  Q.  So, in that capacity did he maybe have more information about

2  what was going on with Mr. Schram at work than the average co-

3  worker?

4  A.  Yes.

5  Q.  Okay.  Did he -- was he aware that he had made a threat

6  toward a different co-worker as well?

7  A.  Yes.

8  Q.  And was he aware that Mr. Schram had been referred to mental

9  health treatment?

10  A.  Yes, on at least four occasions.

11  Q.  And what about substance abuse treatment?

12  A.  At least once.

13  Q.  Okay.  All right.  And so the co-worker, just to kind of put

14  the time frame in place, this order of protection had expired but

15  it had expired about a year and a half before you interviewed

16  him, correct?

17  A.  About a year and a half before what?  I'm sorry.

18  Q.  Before you interviewed him.

19  A.  Oh, yes.

20  Q.  And did he indicate to you that he felt that he was still

21  afraid of Mr. Schram?

22  A.  Yes.

23  Q.  Okay.  Did the defendant during his interview indicate a

24  preference for a certain age of child with regard to his child

25  pornography?

1  A.  Specifically tweens.

2  Q.  And what kind of, for the record, what is a tween?

3  A.  An individual who's not quite a child, but not a teenager

4  either.  So, a kid that would be between the ages of, you know, 9

5  and 12.

6  Q.  Okay.  And is that consistent with the nature of at least

7  several of these -- several of the websites that Defendant

8  hosted?

9  A.  Oh, yes.

10 Q.  Okay.  And I just want to ask you, you're aware that Mr.

11 Schram was arrested for a child molestation case back in --

12 around 1997?

13 A.  Yes.

14 Q.  But you are not currently aware of the circumstances of that.

15 Is that fair to say?

16 A.  That's correct.

17 Q.  Okay.  Had Mr. Schram or the -- did the co-worker that you

18 interviewed, did he indicate that Mr. Schram had at times made

19 individual comments towards other workers' children in addition

20 to the co-worker's?

21 A.  Yes.

22         MS. DUNNING:  Okay.  All right.  Your Honor, I don't

23 think that I have any further questions for Special Agent Davis.

24         THE COURT:  All right.  Is there any cross from the

25 defendant?

1        MR. SCHULTZ:  Thank you, Your Honor.

2                          CROSS-EXAMINATION

3   BY MR. SCHULTZ:

4   Q.  Special Agent, I want to probably work backwards.  You said

5   that you were aware of the '19 -- or the '97 child molestation

6   arrest, is that right?

7   A.  I believe he was arrested.

8   Q.  Okay.  Are you familiar with -- you said you're not really

9   familiar with the details of that case.  Do you know if there was

10  any charge ever filed?

11  A.  I don't.  We tried to get the files from the police

12  department, but they're so old, that the police department was

13  unable to locate the files.  So, now we're having to go back to

14  the court to try to find them there.  So, I really don't have a

15  lot of information about it.

16  Q.  So you're not aware of any conviction or, certainly, an --

17  A.  Oh, no.

18  Q.  Okay.  In regards to this co-worker, you've testified the co-

19  worker had told you that he was afraid of the defendant, that

20  this was something that had occurred, if I remember your

21  testimony correctly, a few years ago, was it 2019 that's the most

22  recent?  Is that right?

23  A.  No.  It was -- so, I believe the defendant was terminated in

24  November of 2017.

25  Q.  2017.

1  A.  So, the -- yes.  So, the majority of the threats were made --

2  the way that the co-worker described it is that the behavior had

3  always been somewhat odd, but that the defendant became

4  increasingly angry and threatening over the summer of 2017.  And

5  then the defendant was ultimately terminated in 2017.  The

6  searches that we had were -- had occurred in 2019.

7  Q.  Okay.  This co-worker you said that he had obtained an order

8  of protection, but that had expired at least a year, year and a

9  half ago, is that right?

10  A.  Yes.  So, he -- I believe he filed the order of protection in

11  January of 2018, and then it expired in January of 2019.

12  Q.  Okay.  And you're not aware of any contact between the

13  defendant and this co-worker since, what, 2018, then?

14  A.  I don't believe so, other than -- no, I don't believe so.

15  Q.  Okay.  Now, obviously you'd searched Mr. Schram's residence

16  at some point, is that right?

17  A.  Yes.

18  Q.  And were you -- were you able to find any weapons of any

19  kind?

20  A.  Yes.  There were two rifles, I believe, and then one other --

21  one other gun, but it looked like it was very old.  I think it

22  was a replica.

23  Q.  What kind of rifles?

24  A.  One was a Bushmaster.  I'm trying to remember the other one.

25  I'm not very familiar.  I believe it's in the -- I believe it's

1  in the report.  If you'd like, I can look it up really quick.

2  Q.  If you don't mind.

3  A.  Sure.

4       THE DEFENDANT:  Are there additional charges being filed

5  against me?

6       MR. SCHULTZ:  Mr. Schram, now is not the time.

7       THE DEFENDANT:  Okay.

8       THE WITNESS:  It was a Henry U.S. Survival .22 LR.

9  BY MR. SCHULTZ:

10  Q.  .22-caliber long rifle?

11  A.  I believe so.

12  Q.  Do you remember what caliber that Bushmaster was?

13  A.  It says XM-15-E2S.  I'm not a gun expert.  That's what I

14  believe were turned over to his dad.

15  Q.  And no handguns?

16  A.  I don't believe so.

17  Q.  Were you able to -- you said that you had found some search

18  history regarding bomb making, pressure cooker bombs, et cetera.

19  Were you able to find any evidence during your search of that

20  kind of device?

21  A.  No.

22  Q.  I want to ask you a couple questions.  First of all, you had

23  said -- you had testified about some sort of situation regarding

24  contact between Mr. Schram and a Minor Subject regarding possible

25  contact with a Minor Victim.  Do you remember what I'm talking

1  about?

2  A.  The situation involving the Minor Victim on the East Coast?

3  Q.  Yeah.

4  A.  Yes.

5  Q.  When -- do you -- when did those conversations take place?

6  Do you know?

7  A.  I don't know because that particular investigation was

8  actually handled by FBI Headquarters.  Our office did not get

9  involved with the defendant until after that child had already

10  been located and the Minor Subject had already been identified.

11  So, I believe it might have been the summer of 2019, but I can't

12  say for sure.

13  Q.  Okay.  Are you aware of any contact between Mr. Schram and

14  the Minor Victim?

15  A.  Yes.  Oh, the minor -- oh, I'm sorry.  The Minor Victim?

16  Q.  Right.

17  A.  No, I apologize.  Only the Minor Subject.

18  Q.  Okay.  And as you testified, the Minor Victim was somewhere

19  on the East Coast.  Was this other Minor Subject also somewhere

20  on the East Coast?

21  A.  He was, and in a different state than the Minor Victim.

22  Q.  Okay.  Now, the contact between Mr. Schram and this Minor

23  Subject, did that all take place by computer or was there any

24  other contact?

25  A.  I believe it was all by computer.

1  Q.  And would it have been through, I believe you testified that

2  there were some websites set up for that purpose.

3  A.  Yes.

4  Q.  Which leads me to my next question.  You testified that your

5  search of Mr. Schram's computer led to some evidence of some

6  websites that he was hosting that contained potentially child

7  pornography, is that right?

8  A.  Yes.

9  Q.  Now, is that -- is that different than what we often see as

10  file sharing through services such as BitTorrent?  Is that

11  different than that?

12  A.  No.

13  Q.  So --

14  A.  Well, it's different in that it does take place on the dark

15  web.

16  Q.  Okay.

17  A.  But it is file sharing.  But these particular websites were

18  forums.  So, individuals could go in there and they could chat

19  within the room and also post links so that individuals could

20  click on those links to go to other areas and view child

21  pornography.  And then they could discuss the child pornography

22  inside the chat room.

23  Q.  But the child pornography, was that actually contained on the

24  cloud, the dark cloud, however it was -- the pornography itself

25  was actually contained on other computers, unknown perhaps?

A.   Possibly.  The forums were basically to post the links or
post information to the individuals on the site about where they
could go to find it.

Q.   Okay.

A.   So, you could click the link in the forum and then view it,
but it wasn't -- it was, yes.  It was, you know, at a -- on a
file hosting site or something like that.

          MR. SCHULTZ:  Okay.  Okay.  I believe that's all the
questions I have, Your Honor.

          THE COURT:  All right.  Thank you, Mr. Schultz.
Anything else, Ms. Dunning?

          MS. DUNNING:  I did just have a few.

                    REDIRECT EXAMINATION

BY MS. DUNNING:

Q.   Special Agent Davis, can you describe the demeanor of the co-
worker when you all made contact with him?

A.   Yes.  He was frantic.

Q.   Okay.

A.   He ran in and immediately asked me if his family was okay,
and was -- he was very emotional.

Q.   Throughout the -- was there anything about his demeanor or
the comments he made throughout the interview that made you
question whether he was truly scared of Mr. Schram?

A.   No.  At the end of the interview when I told him that the
defendant was in jail, he started crying.

1  Q.  Okay.  The website that you've -- that you were asked about,

2  is there language on the websites themselves, the way it's set

3  up, the way someone enters the things that they can see if

4  they're a user that would indicate that it is for child

5  pornography, folks interested in child pornography or child

6  exploitation?

7  A.  Yes.

8  Q.  And are there comments made that anyone can see that would

9  also indicate that?

10  A.  You mean inside the chat forum?

11  Q.  Right.

12  A.  Yes.

13  Q.  Okay.  And the conversation and the posts and things like

14  that that makes it clear to folks what the site is for.

15  A.  That's right, yes.

16  Q.  Okay.  You were asked whether there was evidence of bombs or

17  bomb materials in the defendant's home.  And did the defendant

18  admit in his statement to the other agents that he was furious

19  when he searched for how to make a bomb or how to make napalm?

20  A.  Yes.  He spoke in detail about the plot to kidnap and kill

21  the girl.  But he was still so upset over what had happened at

22  Ford that he really didn't want to talk about it in depth.

23  Q.  Okay.  And how about, did he indicate that he was -- was

24  really serious and intended to harm the co-worker and the co-

25  worker's family?

1  A.  Yes.  He was serious.

2                       (Off Record Talking)

3  BY MS. DUNNING:

4  Q.  You were asked about those firearms --

5                       (Off Record Talking)

6           UNIDENTIFIED MALE:  Ma'am?

7           MS. DUNNING:  Yes.

8           UNIDENTIFIED MALE:  Okay.  So, I didn't know how much

9  longer this was going on.  We have another appointment at four

10 o'clock.

11          THE COURT:  Actually, we kind of started a little late

12 on this because he wasn't down there yet.  But I would say

13 another five minutes.

14          UNIDENTIFIED MALE:  Oh, okay.  Okay.  Thank you.

15          THE COURT:  Okay.  All right.  Thank you.

16 BY MS. DUNNING:

17 Q.  Were there searches made by the defendant related to suicide?

18 A.  Yes.

19 Q.  Okay.  What was he searching?

20 A.  For the suicide hotline and for the suicide crisis prevention

21 number.

22 Q.  Okay.  And you testified that the defendant didn't have any

23 in-person contact with the co-worker after a certain time frame,

24 but did the searches continue long after they worked together,

25 the Internet searches about murdering and about that particular

1  co-worker?  Did they continue long after the defendant no longer

2  worked at Ford?

3  A.  Yes.  He left.  He was terminated.  The defendant was

4  terminated in November 2017.  The protection order was set in

5  January of 2018.  And then it expired in January of 2019.  And

6  the searches were actually, they occurred most frequently right

7  after that protection order expired in January of 2019.

8  Q.  And I should ask, I don't know what the -- what was the time

9  frame of information you had?  Did it go all the way back to

10 2017?

11 A.  It didn't.  It only went from, I believe, January of 2019 to

12 April of 2020, is when the production came back.

13        MS. DUNNING:  Okay.  All right.  I don't have anything

14 further, Your Honor.

15        THE COURT:  All right.  Thank you.  Mr. Schultz,

16 anything further?

17        MR. SCHULTZ:  Very briefly, Your Honor.

18        THE COURT:  All right.  Thank you.  All right.  Thank

19 you.

20        MR. SCHULTZ:  I have one thing, Your Honor.

21        THE COURT:  Oh, okay.  I'm sorry.

22                        RECROSS EXAMINATION

23 BY MR. SCHULTZ:

24 Q.  Special Agent, did Mr. Schram make any statements to anyone

25 that you're aware of about suicide?

1  A.  Not that I'm aware of.

2          MR. SCHULTZ:  That's it, Your Honor.  Thank you.

3          THE COURT:  All right.  Thank you.

4                  (End of Requested Proceedings)

5                  * * * * * * * * * *

6                  (Court Adjourned at 4:09 p.m.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.


/s/ Lissa C. Whittaker        March 30, 2023
Signature of transcriber           Date