# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 5:20-cr-06002-SRB |
| CLINT ROBERT SCHRAM, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

COMES NOW, the United States of America, by and through Teresa A. Moore, United States Attorney, Alison D. Dunning and David Luna, Assistant United States Attorneys, and United States Department of Justice Trial Attorney, Kyle Patrick Reynolds, and respectfully offers the Court the following background, points, authorities, and arguments in the above-captioned matter. For the reasons set forth below, and under the factors set out in 18 U.S.C. § 3553(a), the Government respectfully recommends that the above defendant be sentenced to a Guideline term of lifetime imprisonment, to be followed by a lifetime term of supervised release. The Government also asks the Court to order restitution in amounts agreed upon and listed below, impose the $900 Special Assessment under 18 U.S.C. § 3013, consider imposition of a separate Special Assessment of $5,000 per count under 18 U.S.C. § 3014, and an additional assessment of not more than $35,000 under 18 U.S.C. § 2259A(a)(2).

## I. BACKGROUND

On July 17, 2020, a federal grand jury indicted the defendant Clint Robert Schram on one count of engaging in a child exploitation enterprise in violation of 18 U.S.C. § 2252A(g), four counts of conspiracy to advertise child pornography in violation of 18 U.S.C. § 2251(d) and (e), and four counts of advertisement of child pornography in violation of 18 U.S.C. § 2251(d) and (e).

(D.E. 1.)

On May 8, 2023, the defendant proceeded to trial. After a three-day trial, the jury found him guilty of all counts of the indictment. (D.E. 100.) The United States has moved to dismiss Counts Two, Four, Six, and Eight as lesser-included offenses of Count One. (D.E. 111.)

The Presentence Investigation Report ("PSR") has calculated the defendant's advisory Guidelines range as life imprisonment based on a total offense level of 43 and a criminal history category of I. (PSR, ¶¶ 84-104, 154.) The defendant has filed objections to the PSR, in which he objects generally to every paragraph and specifically to certain Guidelines calculations.

## II. GOVERNMENT'S RESPONSE TO DEFENDANT'S GUIDELINES OBJECTIONS

The defendant's objections to the PSR's Guidelines calculations are without merit. He first claims that he should receive a reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility because he supposedly would have pleaded guilty if he had received a more favorable plea offer. Section 3E1.1 provides for a reduction for a defendant who "clearly demonstrates acceptance of responsibility for his offense," not for a defendant who *might have* accepted responsibility under different circumstances but instead proceeded to trial and stipulated to nothing. The defendant's ongoing failure to accept responsibility is also evidenced by his objections to the PSR, in which he objects to every paragraph, including those containing facts that were proven to the jury.

Second, despite having created, managed, and served as the highest-ranking individual on Websites A, B, C, and D, the defendant now claims that he should not receive an enhancement under U.S.S.G. § 3B1.1(a) for being an organizer or leader of criminal activity that included five or more participants or was otherwise extensive. Evidence introduced at trial demonstrates that the defendant described himself as the "super administrator" of the websites, that he "ma[de] all the decisions," that he could shut the websites down, that he could kick users out of the websites, and that he could view private messages between users without their knowledge. (PSR, ¶¶ 57-58.)

2

Case 5:20-cr-06002-SRB   Document 112   Filed 10/02/23   Page 2 of 13

The United States' trial exhibits include instances of the defendant exercising supervisory control over others on the websites, including staff. For example, he "forgave" a banned user who had been posting child pornography, he instructed other staff members on what types of child pornography should be posted to Website A, he ordered other staff members to post child pornography or else face demotion, he directed other staff members not to mention a particular user, and he banned other users. (*See, e.g.,* GX22 at 4, GX23 at 1, 5, 16, 19.) The defendant's online nickname also appears at the bottom of multiple "guides" instructing Website A users and staff how to fulfill their roles on the site. (*See* GX22A, GX22B, GX22C, and GX22D.) There is thus abundant evidence that he directed numerous other participants, even though § 3B1.1(a) would apply if he directed only one. *See, e.g., United States v. Armstrong*, 60 F.4th 1151, 1167 (8th Cir. 2023).

Finally, he objects to the PSR's assessment of a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. (PSR, ¶¶ 79-82, 91.) The United States notes that the defendant has engaged in threatening, hostile, and bizarre conduct throughout these proceedings. Nevertheless, his total offense level would still exceed level 43 regardless of whether he receives this enhancement or not. (PSR, ¶ 95.) Because this enhancement does not affect the defendant's total offense level or Guidelines range, the United States takes no position on whether he should receive it.

### III. GOVERNMENT'S SENTENCING RECOMMENDATIONS

In fashioning a sentence, the Court is required to consider the nature and circumstances of the offense of conviction, and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The Court must also examine the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and protect the public from further crimes of the defendant. 18 U.S.C. §§ 3553(a)(2), (A) and (C). Finally, the

Court is also required to consider the sentencing range recommended by the advisory United States Sentencing Guidelines. 18 U.S.C §§ 3553(a)(3) and (a)(4). All of these factors support a life sentence, to be followed by a lifetime term of supervised release.

**A.    § 3553(a)(1): The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

This is a truly extraordinary case. It is extraordinary for at least two reasons.

First, the offense conduct is astonishing. It is far more aggravated and outrageous than virtually any child pornography case that does not involve the hands-on abuse of minors. The defendant ran not just one, but *four* websites dedicated to images and videos of child rape, abuse, and exploitation. He hosted and administered these websites from his home in Kansas City. (PSR, ¶¶ 15-54.) Website A was principally devoted to images of girls between the ages of 9 and 12, and it permitted content depicting prepubescent girls being penetrated by adult men. (*Id.*, ¶¶ 16, 23-24.) The defendant admitted to masturbating to child pornography depicting girls in this age range, in part because "they're just so cute." (*Id.*, ¶ 56.) As to Website B, the defendant made clear that "anything goes." It had no age restrictions whatsoever and allowed users to post content that depicted infants, "hurtcore," "gore," sex acts with children that involved urine or feces, and depictions of dead children. (*Id.*, ¶¶ 29-30.) Website C had the same lack of restrictions and allowed users to post the same categories of content, all of which the defendant characterized as "freedom of speech." (*Id.*, ¶¶ 37-38.) The defendant agreed to host Website D for an online friend, and Website D allowed images of children as young as 2, and it likewise permitted depictions of the sexual abuse of children that involved sadism, bestiality, or bodily waste. (*Id.*, ¶ 47.)

Each of these four websites was itself a thriving community, and they allowed like-minded pedophiles to come together, share child pornography, discuss their interests, and indulge their fantasies about the sexual abuse of children. The Sentencing Commission has recognized that

4

child pornography "communities" are far more dangerous places than other faceless forums where individuals can simply exchange and download child pornography. In fact, in its 2012 Report to Congress, the Sentencing Commission correctly noted that such communities are dangerous in part because their existence "increases the likelihood that *other* community members may engage in sex offending to create new child pornography images for trading online." United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, at 94 (December 2012) ("2012 Report") (emphasis in original).[1] They also normalize the sexual exploitation of children, help offenders look at their deviant sexual desires in a positive light, and could possibly lead offenders to progressing from viewing CSAM to committing other sex offenses. *Id.* at 94-98.

The defendant also enthusiastically posted images and videos depicting child rape, abuse, and exploitation to each of his websites. For example, he repeatedly posted a series of videos depicting an eight-year-old girl being forced to submit to sex acts with what purports to be her father. For example, these videos depicted the two engaged in oral and vaginal sex, and the videos repeatedly depict the adult man ejaculating onto the little girl's face and into her mouth. (PSR, ¶¶ 27, 35, 44, 53.) When asked about this video series depicting the horrific sexual abuse of a child, the defendant said the girl was just "having sex with her daddy." (*Id.*, ¶ 59.) Evidence presented at trial also included a video the defendant posted on multiple websites, which depicted an adult man engaged in vaginal sex with a toddler. (*Id.*, ¶ 54.)

The defendant's websites did not just facilitate egregious criminal activity. They also contained specific features and advice intended to allow offenders to continue committing crimes

---

[1] The full report is available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (last visited October 2, 2023).

without detection. For instance, each website operated over a network that is designed to allow users to use the internet anonymously. (GX700 (demonstrative exhibit of James Fottrell)). The defendant's websites also linked to a page that contained voluminous, detailed advice on how not to be caught by law enforcement. (GX20A.) For example, this page counseled its visitors that "child pornogr[a]phy is illegal and can send you to prison," and accordingly, "you must take your safety and security precautions seriously." (*Id.* at 1.) According to the page, this can be accomplished by not sharing any information about one's identity, not even accidentally. It advises not to "say good morning or goodnight, just say hello or good day." (*Id.* at 3.) "Being a bland, neutral pedo who appears to live in Europe and uses American spelling is the safest option." (*Id.* at 4.) "Be aware that anyone you chat with could be law enforcement." (*Id.* at 14.)

All of this advice was likely well heeded by the defendant's coconspirators, as some of them escaped detection altogether. One did not and was arrested. The defendant explained online that this only happened because this now-arrested individual "broke protocol, he broke the rules of engagement. He went off to go meetup with a pedomom to fuck her children…" (PSR, ¶ 69.)

The second reason this case is extraordinary is this: as aggravated as the offense conduct is, it does not even begin to convey the level of danger that the defendant poses to children and to the public at large. Simply put, he is likely to hurt or kill someone if he is permitted to live life as a free man at any point in the future.

Before his arrest, the defendant made specific plans with another member of his websites to kidnap, enslave, rape, and murder a specific eight-year-old girl living outside the state of Missouri. The United States will present additional details about this plot during the sentencing hearing. (PSR, ¶¶ 60, 66.) The defendant claimed during his post-arrest interview that he was not serious about this, in part because he did not have the "gas money" to carry out the kidnapping. But the defendant stated that his confederate "really was gonna rape her." (*Id.*, ¶ 60.) And he

6

admired his plan online, noting that "[d]oing a home invasion at 3am locked and loaded with high powered weaponry snatching and grabbing a kid and then murdering any witnesses … much better chance of sucsess [sic]." (*Id.* ¶ 69.) Fortunately, this girl was identified and protected by the FBI, and the defendant's confederate was arrested.

Although the defendant said he was not serious about kidnapping a little girl, he told the FBI that he *was* serious about murdering a former coworker, R.B. He stated that he wanted to murder R.B. and considered murdering R.B.'s family because "there's pain in that. He has to live with that for the rest of his life." The defendant further told FBI investigators that he planned to set off a bomb in R.B.'s workplace, and anyone else who may have been killed or harmed would simply be "collateral damage." (PSR, ¶ 61.) The defendant's seriousness about this threat is corroborated by his Google searches, which included searches about the penalties for first-degree murder in Missouri, pressure cooker bombs, black powder bombs, napalm, whether someone can be convicted of murder without a body, and the death penalty in Missouri. He also made statements on his websites that he will be "going hunting for the man that fucked me over in real life and I intend to murder him and then kill myself. I may even kipnap [sic] a child and rape her in the process just as a final fuck you to the world. Any case Just know that this week when I am absence from being online I am either sleeping or stalking an evil man that I intend to murder for destroying my life!" (*Id.*, ¶ 65.)

Pretrial detention has not chastened the defendant in the least. In fact, it seems to have invigorated his tendency toward violent conduct and threats based upon pretrial detention conduct reports. For example, according to one report, he tried to strangle his sleeping cellmate with a homemade rope. (PSR, ¶ 4.) According to another report, he attacked yet another inmate at a different detention facility. (*Id.*, ¶ 5.) He has repeatedly threatened murder or harm to people involved in his incarceration, including prison officials and a Magistrate Judge of this court. (*Id.*,

7

¶¶ 8-9, 13-14, 118.) These threats included Nazi and racist symbols and language, and he specifically called the Magistrate Judge the most odious word in the English language. (*Id.*) The defendant also claimed to have committed rape and murder in the past, including the murder of a child.

Finally, pretrial detention also has not stopped the defendant from trafficking in sexualized images of children. Deprived of the ability to download and view images of child sexual abuse, the defendant began drawing his own. On multiple occasions, the defendant was found to have drawn graphic scenes depicting adult men engaged in a variety of sex acts with young girls. He also showed some of these drawings to his fellow inmates. (PSR, ¶¶ 6-7, 12.)

All told, the defendant engaged in shockingly serious offense conduct. And outside of that offense conduct, he has engaged in violent, threatening behavior toward numerous people with whom he has come into contact. He is an absolute danger to society.

**B.     3553(a)(2) The Need for the Sentence Imposed to –**

**i.     Reflect Seriousness of the Offense, Provide Just Punishment, and Promote Respect for the Law**

A life sentence is what is needed to reflect the seriousness of the offense and the defendant's other conduct, and this sentence appropriately recognizes the seriousness of the crime perpetrated. This sentence is a just sentence that will command respect for the law.

**ii.     Promote Adequate Deterrence**

A life sentence is necessary to deter the defendant from committing other crimes. As noted above, pretrial detention has not stopped him from repeatedly drawing images of child rape and abuse. These acts amount to serious felony offenses in their own right. *See, e.g.,* 18 U.S.C. § 1466A(a)(1) and (b)(1). There is no reason to think that the defendant will in fact stop his criminal conduct if he is ever released from prison.

8

General deterrence is critical here, too. The defendant's website allowed people to be anonymous, and it provided specific advice about how not to be caught by law enforcement. Members of the defendant's websites were never caught, possibly because they followed the defendant's detailed advice. A life sentence would also signal to unidentified and unarrested coconspirators, as well as others who may consider committing child pornography offenses on the dark web, that this conduct is unacceptable and will be met with swift and serious punishment.

### iii. Protect the Public from Further Crimes of the Defendant

The defendant has proven himself to be a violent, dangerous person. He has repeatedly committed acts of violence against others, even in pretrial detention. By his own admission, he seriously planned to murder R.B. and his family as well. His plot to kidnap, rape, and murder an eight-year-old girl was also so detailed that it cannot be casually dismissed as mere fantasy. Without incapacitation, there is a high likelihood that he will kill or seriously injure someone, as he has so prolifically threatened to do.

In addition, the defendant's criminal conduct reveals that he is a danger to the most vulnerable members of society in that he views images of minor children engaging in sexually explicit conduct as a means to gratify his sexual appetite. His offense conduct and history and characteristics indicates he is unwilling to comport his behavior to the law. His willingness to risk committing such crimes in favor of satisfying his depraved needs without regard for the consequences, present a worrisome prognosis for public safety. And his sexual interest in underage girls appears to be so intense that not even pretrial detention has stopped him from indulging in images depicting their sexual abuse. He no longer has access to online child pornography, but he has repeatedly created his own pictures of child sexual exploitation.

No sentence other than a life sentence can protect the community from the defendant, who has consistently shown that he is a threat to others both inside and outside of a correctional facility.

## IV. RESTITUTION

Restitution is mandatory in this case, and the court is bound to order a restitution amount that reflects the defendant's relative role in the causal process that underlies each victim's losses, but which is not less than $3,000. 18 U.S.C. § 2259(a), (b)(2)(B). The amount of restitution ordered to a victim should not turn on the economic circumstances of the defendant. *Id.* § 2259(b)(4)(B)(i).

According to the PSR, and information obtained since the PSR was filed, the following victims have submitted restitution requests to date, and in the following amounts:

| Series | Restitution Request |
|---|---|
| At School (Violet) | $10,000 |
| Vicky (Lily) | $10,000 |
| Jenny | No less than $3,000 |
| Sweet White Sugar (Pia) | $5,000 |
| Sweet White Sugar (Mya) | $5,000 |
| PinkHeartSisters (Erika and Tori)[2] | No less than $3,000 each |
| Marineland1 (Sarah) | $10,000 |
| MotorCouch (Cara) | $125,000 |
| RedGlassesCry (Taylor) | $3,000 |
| 2crazygirls (Chelsea) | No less than $3,000 |
| Angela | No less than $3,000 |
| Aprilblonde (April) | No less than $3,000 |
| Ashley 081 (L.L.) | No less than $3,000 |
| Blue Pillow 1 (Henley) | $5,000 |
| Cinder Block Blue (Jane) | No less than $3,000 |
| Jan_Socks 1 (Sierra) | $10,000 |
| Jan_Socks2 (Savannah) | $7,500 |
| Jan_Socks3 (Skylar) | $7,500 |
| JB Flowers 1 (Jen) | No less than $3,000 |
| JB Flowers 2 (Ivy) | No less than $3,000 |
| BluesPink 1 (Fiona) | No less than $3,000 |
| HG1 (Lily) | $3,000 |
| Linda & Patty 1 (Patty) | $3,000 |
| PD11 | Unknown |

---

[2] "Tori" passed away on July 6, 2023.

The victims listed in this chart are victims depicted in child pornography that was found on the defendant's devices, not necessarily in content that he or others shared over Website A through D. (The FBI could not possibly monitor the websites around the clock, and it could not even practically catalog all the child pornography that was shared over the websites while undercover FBI agents were logged into the site.) Generally speaking, 18 U.S.C. § 2259 applies to victims of the count of conviction and not to ancillary conduct. *See, e.g., Paroline v. United States*, 572 U.S. 434, 445 (2014) ("a straightforward reading of § 2259(c) indicates that the term 'a crime' refers to the offense of conviction. So if the defendant's offense conduct did not cause harm to an individual, that individual is by definition not a 'victim' entitled to restitution under § 2259.") (cleaned up). The defendant was not formally charged with possession of child pornography.

Nevertheless, the United States submits that the victims in this chart are still entitled to restitution. The evidence presented at trial established that the defendant used the computer devices in his home to create and run four websites dedicated to the advertisement, distribution, and exchange of child pornography. These websites were active and frequented by numerous users. The indictment in this case charged all of the defendant's conduct in establishing and maintaining these websites as a broad-ranging child exploitation enterprise. (D.E. 1.) It also charged him with advertising child pornography himself over those websites, and the evidence presented at trial established that he did so in large volumes.

All four of these websites ran off of an HP Desktop computer in the defendant's home. (PSR, ¶ 55.) This exact same HP Desktop computer that hosted Websites A-D and an external device found on top of that HP Desktop contained thousands of images of child pornography, including the images and videos of child pornography that depict the victims listed in the chart above.

11

Under these circumstances, the United States submits that there is a clear nexus between the defendant's offense conduct of running and advertising child pornography over Websites A, B, C, and D, and his possession of the images and videos depicting the victims seeking restitution. The Court can and should infer that the defendant maintained this child pornography on his HP Desktop in order to share over his websites or that he ultimately obtained that content by other people sharing it over the websites that he created and facilitated. In either case, his possession of the images on the same computer that hosted the websites, as well as ancillary devices, would be an act in furtherance of the charged enterprise. This might be different, for example, in a case in which a defendant who possessed child pornography also had some limited exposure to an online child pornography community. Here, there is a much stronger inference that the defendant's possession of child pornography was part of the charged and convicted conduct.

## V. **CONCLUSION**

The defendant is a serious danger to the public, especially to children. His crime of conviction demonstrates his sexual desire for children and his willingness to engage in crimes furthering the sexual victimization of those children. His other conduct, including his repeated threats of murder and acts of violence, starkly illustrates the threat that he poses to innocent people.

A life sentence would reflect the seriousness of the offense, promote respect for the law and provide just punishment. Further, a sentence of this length will protect the public, particularly children, from future crimes committed by this defendant. Upon a lengthy and extensive review of any and all applicable provisions of the statutes and the facts and circumstances of this case, there exists no basis for further downward departure or downward variance, or a consideration of 3553(a) factors that would justify a sentence below the term requested by the Government. The defendant deserves, and has earned, a life sentence followed by a lifetime term of supervised release.

12

Case 5:20-cr-06002-SRB    Document 112    Filed 10/02/23    Page 12 of 13

Respectfully submitted,

Steven J. Grocki
Chief, Child Exploitation and Obscenity Section
U.S. Department of Justice, Criminal Division

By:    /s/ *Kyle P. Reynolds*

Kyle Patrick Reynolds
Trial Attorney
1301 New York Avenue NW
Washington, DC 20530
Telephone: (202) 616-2842

Alison D. Dunning
David Luna
Assistant United States Attorneys
Charles Evans Whittaker Courthouse
400 E. Ninth Street, Room 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was delivered on October 2, 2023, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

/s/
Kyle P. Reynolds
Trial Attorney
U.S. Department of Justice, Criminal Division